### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>MITERALE ESPINAL-CRUZ, | CRIMINAL ACTION<br>NO. 24-174-1 |

**Pappert, J.**                                                              **November 26, 2024**

### MEMORANDUM

Miterale Espinal-Cruz is a native and citizen of the Dominican Republic. He was convicted on drug charges in Philadelphia in 2005, though he didn't stick around long enough to find that out. He fled while the jury was deliberating and two years later was sentenced *in abstentia* to five to ten years in prison. He was next heard from in 2018 when he pled guilty to illegally entering Puerto Rico and was deported. He currently faces sentencing on his most recent transgression: reentry after that deportation.

The upcoming sentencing presents a very unique issue under the United States Sentencing Guidelines. The defense objects to a substantial increase in the offense level and addition of three criminal-history points for the 2005 conviction and 2007 sentence both recommended by the United States Probation Office in the Presentence Investigation Report. The sentence was not imposed within fifteen years of the commencement of Espinal-Cruz's reentry after deportation, which only came to light after he was arrested in 2023 for retail theft in Bucks County and convicted of that offense earlier this year. And, in any event, that sentence never resulted in him "being incarcerated" within the fifteen-year timeframe because he cut and ran.

Both sides want the Court to declare certain guideline provisions "genuinely ambiguous" to bring into the analysis aspects of the guideline commentary which support their arguments. The defense thinks including the drug conviction in the guideline calculation would run counter to the purposes of the fifteen-year lookback period while the Government believes that ignoring the prior conviction would reward individuals previously deported or removed from the country for fleeing, while those who remained and served their time would pay the price.

After considering the parties' briefing and holding oral argument, neither relevant guideline provision is genuinely ambiguous and the Court cannot defer to the commentary. This results in the recommended increase to the offense level, though without the addition of the three criminal-history points. The Court thus overrules the defense's objection to the increased offense level but sustains it as to the points.

I

Espinal-Cruz pled guilty on September 4, 2024 to a one-count indictment charging him with reentry after deportation in violation of 8 U.S.C. § 1326(a) and (b)(1). (PSR ¶ 1–2); (ECF No. 19.) He had been removed from the United States in June of 2018 after pleading guilty in the United States District Court for the District of Puerto Rico to improper entry by an alien in violation of 8 U.S.C. § 1325(a)(1). (PSR ¶¶ 10–12.) He was arrested in Bensalem, Pennsylvania on September 7, 2023 for retail theft and pled guilty to that charge in the Bucks County Court of Common Pleas in January 2024. (*Id.* ¶ 13.)

The Probation Office prepared its Presentence Investigation Report which revealed another prior adult criminal conviction, this one for drug trafficking in Philadelphia. (PSR ¶ 9.) Espinal-Cruz was arrested in July of 2003 after undercover

officers caught him supplying a street-level dealer with seventy grams of heroin. (*Id.*) In November of 2005, he was convicted by the jury of two counts of manufacture, delivery or possession with intent to manufacture or deliver a controlled substance and criminal conspiracy. (*Id.* ¶¶ 9, 22.) He wasn't around to hear the verdict — he went on the lam during the jury's deliberations, not to be seen again by the authorities until his 2018 arrest in Puerto Rico. (*Id.* ¶ 10.) On February 1, 2007, Espinal-Cruz was sentenced *in abstentia* in the Philadelphia Court of Common Pleas to five to ten years' incarceration. (*Id.* ¶ 9.)

The Probation Office recommended a ten-level increase to the base offense level for his 2005 drug trafficking conviction pursuant to § 2L1.2(b)(2)(A). (*Id.* ¶ 22.) That provision calls for such an increase if, before being ordered deported or removed from the United States for the first time (here, June of 2018), the defendant engaged in criminal conduct that, "at any time," resulted in a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed was five years or more. U.S.S.G. § 2L1.2(b)(2)(A). The PSR also added three criminal-history points for this conviction under § 4A1.1(a), given that the sentence imposed in 2007 exceeded one year and one month. (PSR ¶ 33.) Applying this increase and these criminal-history points resulted in a recommended advisory sentencing guideline range of thirty-seven to forty-six months' incarceration. (*Id.* ¶ 58.)

Espinal-Cruz objects to both the ten-level increase and the addition of the three criminal-history points. He argues that § 2L1.2(b)(2)(A) is genuinely ambiguous, such that under *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021), the Court should defer to the commentary to the guidelines, specifically Application Note 3 to § 2L1.2, which

instructs that criminal convictions may only be counted under § 2L1.2(b)(2)(A) if they receive criminal-history points under, *inter alia*, § 4A1.1(a). (Def. Sent. Memo. at 8, ECF No. 24.) And since § 4A1.1(a) implicates § 4A1.2(e)(1), Espinal-Cruz believes neither the ten-level enhancement nor the three criminal-history points should be included because his drug trafficking sentence, imposed on February 1, 2007, was more than fifteen years prior to the commencement of his reentry after deportation. (*Id.*) Without the ten-level increase and the attendant criminal-history points, Espinal-Cruz's advisory guideline range would be lowered to six to twelve months' incarceration.

The Government agrees with the PSR. It contends that § 2L1.2(b)(2)(A) is not ambiguous and that the ten-level increase thus applies. It then argues that § 4A1.2(e)(1) *is* genuinely ambiguous and that the Court should defer to its commentary, specifically Application Note 2, to add the resulting three criminal-history points. (Gov't Sent. Memo. at 10, ECF No. 25.) The commentary, in the Government's view, belongs in the Court's analysis because it accounts for a defendant's "escape" when interpreting § 4A1.2(e)(1)'s second sentence contemplating the defendant's "being incarcerated" during the fifteen-year period. (*Id.*)

II

A sentencing court must always consider the applicable range under the sentencing guidelines. 18 U.S.C. § 3553(a). The guidelines generate this range based upon (1) the nature of the offense and (2) the defendant's criminal history. U.S.S.G. § 1B1.1(a). Although the guideline range is advisory — meaning the court is not bound to sentence a defendant within the prescribed range — the court must nonetheless

correctly calculate the applicable range before imposing a sentence. *Gall v. United States*, 552 U.S. 38, 46, 51 (2007).

The United States Sentencing Commission also provides commentary to the guidelines. *See* U.S.S.G. § 1B1.7. But while courts *must* follow the guidelines in calculating the applicable sentencing range, courts treat the commentary as they would "an agency's interpretation of its own legislative rule" and thus defer to that commentary only when the guideline being interpreted "is genuinely ambiguous." *United States v. Nasir*, 17 F.4th 459, 470–71 (3d Cir. 2021) (quotations omitted). A guideline is ambiguous when, after exhausting all the tools of statutory construction, it is "susceptible to more than one reasonable reading." *See Kisor v. Wilkie*, 588 U.S. 558, 566 (2019).

Statutory construction always "begin[s] by analyzing the statutory language." *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 251 (2010). When interpreting the meaning of a word or phrase, the court presumes that the word or phrase carries its ordinary meaning. *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022); *Sandifer v. U.S. Steel Corp.,* 571 U.S. 220, 227 (2014). Determining ordinary meaning can include considerations of how the word or phrase is typically used, as well as dictionary definitions. *See Wooden v. United States*, 595 U.S. 360, 367 (2022); *Banks*, 55 F.4th at 257; *United States v. Mercado*, 81 F.4th 352, 356 (3d Cir. 2023). Whether a word or phrase's ordinary meaning is ultimately the correct meaning, however, depends on context, including the individual sentence, particular provision, and broader statutory scheme in which the word or phrase appears. *See Pulsifer v. United States*, 601 U.S. 124, 132–33 (2024).

Often these tools will reveal that there is only one plausible meaning of the text. *Kisor*, 588 U.S. at 575. Only in a case where they do not may the court deem a guideline ambiguous and defer to the Sentencing Commission's interpretation as expressed in the commentary. *See Nasir*, 17 F.4th at 471.

### III

#### A

To support his contention that the ten-level increase to the offense level under § 2L1.2(b) does not apply, Espinal-Cruz points to Application Note 3 of § 2L1.2, which states "[f]or purposes of applying subsection . . . (b)(2) . . . , use only those convictions that receive criminal-history points under § 4A.1.1(a), (b), or (c)," and § 4A1.1(a) requires the addition of three criminal history points for each "prior sentence of imprisonment exceeding one year and one month." (Def. Sent. Memo. at 8.) The term "prior sentence of imprisonment" is then read in accordance with § 4A1.2(e)(1), which counts such sentences in the criminal history score computation provided they were imposed within fifteen years of the defendant's commencement of the instant offense.

Espinal-Cruz thus argues that his 2005 conviction for which his five-to-ten-year sentence was imposed on February 1, 2007 should not result in the ten-level increase under § 2L1.2(b)(2)(A) because it falls outside this lookback period. (Def. Sent. Memo. at 4.) In response, the Government argues that § 2L1.2(b)(2)(A) is not ambiguous, precluding reference to Application Note 3. (Gov't Sent. Memo. at 10.)

#### B

Espinal-Cruz puts the cart before the horse. The Court cannot consider the effect of 2L1.2 Application Note 3, which would incorporate § 4A1.2(e)'s fifteen-year

6

lookback period, because § 2L1.2(b)(2)(A) is unambiguous. The Court starts, and ends, with the text of § 2L1.2(b)(2)(A):

> If, before the defendant was ordered deported or ordered removed from the United States for the first time, the defendant engaged in criminal conduct that, *at any time*, resulted in . . . a conviction for a felony offense (other then an illegal reentry offense) for which the sentence imposed was five years or more, increase by 10 levels.

U.S.S.G. § 2L1.2(b)(2)(A) (emphasis added). This language could not be clearer. It instructs courts to apply the enhancement if the defendant's criminal conduct occurred before the first deportation and if that conduct "at any time" resulted in a felony conviction accompanied by a sentence of five years or more. "At any time" means at *any* time, not just within the previous fifteen years.[1] The plain meaning of this text speaks for itself, so there is no reason to refer to 2L1.2 Application Note 3 or § 4A1.2(e).

Espinal-Cruz fits squarely within this guideline. He engaged in criminal conduct in 2003, prior to his first deportation, that resulted in a felony conviction, and he was sentenced to five-to-ten years' incarceration. He is subject to the ten-level enhancement.

Espinal-Cruz claims that this cannot be the proper reading of § 2L1.2(b)(2)(A) because it would capture every conviction in an illegal reentrant's past, without limitation. (Oral Argument Tr. at 13:4–13.) Not so. This provision contains plenty of limitations: it applies the ten-level enhancement *only if* the defendant was previously deported, the criminal conduct occurred before the first deportation, the criminal

---

[1] Not surprisingly, Merriam-Webster defines "any" as "one, some, or all *indiscriminately* of whatever quantity" or "unmeasured or *unlimited* in amount, number, or extent." *Any*, Webster's Ninth New Collegiate Dictionary (1988) (emphasis added). Thus, "at any time" means an unlimited period of time.

7

conduct resulted in a felony conviction and that felony conviction resulted in a sentence of at least five years' incarceration. True, the provision does not restrict when the conviction and sentence must have occurred. But this is central to the guideline's purpose, to punish *conduct*. Without the phrase "at any time," § 2L1.2(b)(2) could be read to require that a defendant's conduct, conviction *and* sentence occur before his first deportation.[2]

IV

A defendant's criminal-history score depends upon his or her prior convictions and sentences. Relevant here, "for each prior sentence exceeding one year and one month," the defendant's criminal-history score is increased by three points. U.S.S.G. § 4A1.1(a). But § 4A1.2(e) limits the sentences subject to this increase:

> Any prior sentence of imprisonment exceeding one year and one month that was *imposed* within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that *resulted in the defendant being incarcerated* during any part of such fifteen-year period. . . . Any prior sentence not within the time periods specified above is not counted.

U.S.S.G. § 4A1.2(e)(1), (3) (emphasis added).

Pointing to this provision, Espinal-Cruz argues that his 2007 sentence cannot be counted towards his criminal-history score because it was imposed more than fifteen years before he commenced the instant offense and he "did not serve any part of that sentence within the fifteen-year look back period." (Def. Sent. Memo. at 4.) The government, however, points out that Espinal-Cruz only avoided "being incarcerated"

---

[2] Although the purpose of this provision can be gleaned from its text and context, the Sentencing Commission has stated that "the application of the § 2L1.2(b)(2) enhancement depends on the timing of the underlying 'criminal conduct,' and not on the timing of the resulting conviction." U.S.S.G. App. C, Amend. 809 (2016).

8

as a result of that sentence within the relevant period because he fled mid-trial, failed to appear at sentencing and never surrendered himself afterwards. (Gov't Sent. Memo. at 4–5.) The government defines this as an escape and points to the guideline commentary, (*id.*), which states that "[t]o qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence (or, if the defendant escaped, would have served time)." U.S.S.G. § 4A1.2 cmt. n.2.[3]

Again, the Court cannot defer to this commentary unless § 4A1.2(e)(1) is ambiguous, which turns on whether the word "resulted" is ambiguous. For a "sentence of imprisonment" to have "*resulted*" "in the defendant being incarcerated," must the defendant have *actually been* incarcerated (as Espinal-Cruz argues) or is it sufficient that he *would have* been had he stayed put and served the sentence (as the government argues)?[4]

A

As used in ordinary conversation, "resulted" means to have a causal effect or to bring about some consequence, end or outcome. For example, if one says "the American Revolution resulted in the independence of the Thirteen Colonies," the speaker is referring to one thing that happened, which in turn led to another thing that happened.

This ordinary use of the word comports with its dictionary definition. *See, e.g.*, *Result*, Webster's Third New International Dictionary (1993) ("[T]o proceed, spring, or

---

[3]     The government also points to *United States v. Radziercz*, 7 F.3d 1193 (5th Cir. 1993), which conducted no ambiguity analysis and simply relied on the commentary to hold that an escapee's otherwise-barred sentence counted towards his criminal-history score. Because the Fifth Circuit has retained a deferential approach to the guideline commentary, *see United States v. Vargas*, 74 F.4th 673 (5th Cir. 2023), *Radziercz* is not, in light of *Nasir*, helpful in this circuit.

[4]     The guideline text defines "sentence of imprisonment," but this definition doesn't help decipher the text in subsection (e). *See* U.S.S.G. § 4A1.2(b).

9

arise as a consequence, effect, or conclusion: come out or have an issue[.]"); *Result*, Oxford English Dictionary (2d ed. 1989) ("To arise as a consequence, effect, or conclusion *from* some action, process, etc.; to end or conclude *in* a specified manner."); *see also Result*, Black's Law Dictionary (4th rev. ed. 1968) ("To proceed, to spring, or arise, as a consequence, effect, or conclusion; to come out, or have an issue; to terminate; to end."). Using the ordinary meaning of "resulted" in § 4A1.2(e)(1), a defendant must have actually been incarcerated pursuant to the sentence of imprisonment. The guideline text doesn't provide for probable, possible or normative outcomes (e.g., what would, could or should have occurred) but only for the actual occurrence of a particular outcome.[5]

This reading of § 4A1.2(e)(1) is also confirmed by § 4A1.2(k), which explains how "[r]evocation of probation, parole, supervised release, special parole, or mandatory release may affect the time period under which certain sentences are counted" in subsection (e). U.S.S.G. § 4A1.2(k)(2). For "an adult term of imprisonment totaling more than one year and one month," the sentencing court must use "the date of last

---

[5] "Result," as a verb, is also used to refer to logical or deductive consequences in the context of, for example, mathematics or formal logic (e.g. adding two plus two results in four). *See Result*, Black's Law Dictionary (12th ed. 2024) ("To be a physical, *logical* or legal consequence; to proceed as an outcome or conclusion[.]") (emphasis added). But it's implausible that where § 4A1.2(e) says "a sentence of imprisonment . . . that resulted in the defendant being incarcerated," it means "a sentence of imprisonment, the logical consequence of which was the defendant being incarcerated." For one, § 4A1.2(e) speaks of a concrete happening — i.e., "being incarcerated" pursuant to a particular "sentence of imprisonment" — not abstract proofs or models. More importantly, it would be strange to say that "being incarcerated" is the logical consequence of a "sentence of imprisonment." A logical consequence necessarily follows from its premises, see JC Beall & Greg Restall, Beall, *Logical Consequence*, The Stanford Encyclopedia of Philosophy (Fall 2009 Edition), Edward N. Zalta (ed.), and one could certainly receive a sentence of imprisonment yet never spend a second behind bars (e.g., if he dies or escapes). To be sure, English speakers also sometimes use "logical consequence" colloquially to mean "expected consequences" or "typical consequence," but at that point they've exited the context of logic and math in which "result" carries its possible alternative meaning.

10

release from incarceration on such sentence" to determine whether a sentence counts towards a defendant's criminal-history score. *Id.* In other words, if a sentence of imprisonment was imposed prior to the fifteen-year window and the defendant was, during that timeframe, only ever on parole pursuant to that sentence, it will not count. But if that defendant's parole was revoked and he served time pursuant to the original sentence during the relevant period — that is, if the sentence resulted in his being incarcerated during the relevant period — the sentence counts.

B

At first blush, reading "resulted" to require the defendant's actual incarceration is, as applied to Espinal-Cruz's conduct in this case, an uncomfortable fit with the purpose of the criminal-history score. Excluding his 2007 sentence rewards him for evading justice by giving him a lower criminal-history score than a similarly situated defendant who did his time. But the guidelines account for oddities like this, so the broader context in which § 4A1.2(e)(1) sits weighs against deviating from the ordinary meaning of "result."

The guidelines as a whole allow the sentencing court to exercise its discretion and adjust a defendant's sentence in unusual circumstances. Indeed, the introduction to the guidelines instructs courts "to treat each guideline as carving out a 'heartland,' a set of typical cases." U.S.S.G. § 1A1(4)(B). The sentencing court "should depart from a guideline-specified sentence"[6] in cases where a guideline "linguistically applies" yet the

---

[6] Departures are "enhancements of, or subtractions from, a guidelines calculation" authorized by some provision of the guidelines themselves, such as § 4A1.3. *United States v. Brown*, 578 F.3d 221, 225 (3d Cir. 2009). Departures have been a feature of the guidelines since before the Supreme Court's decision *in United States v. Booker*, 543 U.S. 220 (2005) rendered the guidelines advisory. *See, e.g., United States v. Patterson*, 97 F. App'x 389 (3d Cir. 2004) (affirming upward departure pursuant to § 4A1.3).

11

relevant "conduct significantly differs from the norm" because it involved "circumstance[s] . . . not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 1A1(4)(B) (quoting 18 U.S.C. § 3553(b)).

Of particular relevance to this case, § 4A1.3 of the guidelines authorizes departures based on prior conduct for which the criminal-history calculation does not account. *See* U.S.S.G. § 4A1.3(a)(1); *see also United States v. Perry*, 460 F. App'x 149, 154 (3d Cir. 2012) ("We cannot stress enough that § 4A1.3 was designed to 'provide flexibility in those cases where a point-by-point calculation of the defendant's criminal-history category is not alone sufficient to reflect his culpability and dangerousness.'"). In addition, post-*Booker*, courts have substantial discretion to vary upwards or downwards from the guideline range.[7]

Courts have indeed departed or varied upward from a defendant's guideline range based on conduct that the fifteen-year lookback in § 4A1.2(e) excluded from the defendant's criminal-history-score calculation. *See, e.g.*, *United States v. Perry*, 460 F. App'x 149, 153–54 (3d Cir. 2012) (holding that juvenile sentences and adult sentences more than fifteen years old may be considered by a court in granting an upward departure); *United States v. Perez*, 802 F. App'x 408, 412, 415 (10th Cir. 2020) (holding

---

[7]     Unlike departures, which are based on particular provisions of the guidelines and must be raised by motion, variances are "based on a judge's review of all the § 3553(a) factors and do not require advance notice." *See Brown*, 578 F.3d at 225–26. There is substantial overlap between the two, though, as "many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court—with greater latitude—under section 3553(a)." *United States v. Lofink*, 564 F.3d 232, 240 (3d Cir. 2009) (cleaned up).

that conduct too old to be factored into the defendant's criminal-history score was a proper consideration under the § 3553(a) factors and approving upward variance).[8]

The structure and purpose of the guidelines thus weigh in favor of giving the word "resulted" in § 4A1.2(e) its ordinary meaning.[9] Rather than give "resulted" an unnatural construction, the Court may account for the anomalous circumstances of this case when considering whether to depart or vary from the guideline range.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.

---

[8] To the extent the government, in contending that the defendant's argument would lead to an "absurd result," invokes the absurdity doctrine, it has failed to meet the high bar that doctrine sets. *See New Jersey Bankers Ass'n v. Att'y Gen. New Jersey*, 49 F.4th 849, 858 (3d Cir. 2022) (stating an absurd outcome is one "so contrary to perceived social values that the [drafters] could not have intended it") (internal quotation marks omitted). An outcome is not absurd so long as a court can imagine a "conceivable justification for [it]—even if the result carries negative consequences." *Id.* (quoting *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588–89 (3d Cir. 2020)). The guidelines themselves provide a sensible justification for failing to include an exception to § 4A1.2(e) for escapees. The guidelines account principally for "typical cases," which makes sense because "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. § 1A1(4)(B). And it's certainly atypical that a defendant would escape his sentence and then evade recapture for more than fifteen years before commencing a new offense, so the guidelines leave the sentencing court to account for those circumstances when they arise.

[9] A provision's history can also provide clues as to its meaning. *See Wooden*, 595 U.S. at 371–76 (discussing the history of an amendment to the Armed Career Criminal Act). But here, the history provides little, if any, insight. Section 4A1.2(e)(1) was part of the guidelines when they were first promulgated in 1987. At the time, it counted "any prior sentence of imprisonment exceeding one year and one month that resulted in the defendant's incarceration during any part of such fifteen-year period." The current version — which includes the phrase "whenever imposed" and uses "defendant being incarcerated" in place of "defendant's incarceration" — was made effective in 1989. U.S.S.G. App. C, Amend. 262 (1989) (explaining the amendment was meant to "clarify" that the provision concerns "any part of the defendant's imprisonment and not only [its] commencement"). This change didn't alter the word "resulted" or relate to how expansive or narrow its meaning is.